# In the United States Court of Federal Claims

No. 19-339C
Filed: April 14, 2022

---

**CULLY CORPORATION,**

*Plaintiff,*

**v.**

**THE UNITED STATES,**

*Defendant.*

---

*Samuel Fortier*, Fortier & Mikko, P.C., Anchorage, AK, for Plaintiff.

*Joseph A. Pixley*, Trial Attorney, *L. Misha Preheim*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with *Robin M. Richardson*, Senior Environmental Litigation Attorney for AF/JA-Operations and International Law, Environmental Law and Litigation Division, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

Alaska is different. As Chief Justice Roberts succinctly states, in application of the law, "Alaska is often the exception, not the rule." *Sturgeon v. Frost*, 577 U.S. 424, 440 (2016). This case concerns the extent of one such exception. Plaintiff, Cully Corporation ("Cully"), is a Native village corporation of Point Lay, Alaska. In that capacity, Cully claims that the United States Air Force (the "Air Force") donated to it three buildings in 2005. (Sec. Am. Compl. at 6–7, ECF No. 42). Several years after that purported transfer, the Air Force independently determined the prior transaction violated federal regulations and concluded that the buildings were never effectively transferred. The buildings were subject to a lease to the North Slope Borough (the "NSB" or the "Borough"). Cully assumed, based on discussions with the Air Force, that the buildings were removed from the lease after transfer; they were not, and an Alaskan state court found that Cully does not hold a present possessory interest. This Court is bound by that finding. The questions that remain at this stage are whether Cully can maintain a takings claim against the Air Force and whether it has established a quantum meruit claim.

The parties move for summary judgment, (Pl.'s Mot., ECF No. 80; Def.'s Mot., ECF No. 83). For the reasons set forth, the Court finds that Cully has established a valid, reversionary interest in the property at issue; however, genuine issues of material fact remain for trial to determine whether a taking has occurred or could occur. Second, the Court is unable to resolve Cully's quantum meruit claim on the United States' motion. Therefore, the cross-motions for summary judgment are denied.

# I.   Background[1]

### A.   Alaska Native Regional and village corporations

The Alaska Statehood Act of 1958, (72 Stat. 339) Public Law 85-508, 85th Congress, H. R. 7999, July 7, 1958, allotted Alaska approximately 104 million acres of land and accompanying mineral rights, an unprecedented land grant to a new state at that time. This Act did not comprehensively acknowledge many concerns of Alaskan natives. Among other shortcomings, the Statehood Act failed to address the issue of legal title to land claimed by Alaska Natives. *See generally Alaska v. United States*, 35 Fed. Cl. 685 (1996) (providing an overview of the political debates surrounding Alaska's statehood). Additional legislation was necessary to rectify claims to land.

The Alaska Native Claims Settlement Act ("ANCSA"), Pub. L. No. 92–203, 85 Stat. 668 (1971) (codified as amended at 43 U.S.C. §§ 1601–1629f), sought to achieve "a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a). In order to effectuate this, the ANCSA authorized the transfer to Native Alaskans of 40 million acres of land and $962.5 million in direct payments and mineral royalties. § 1602(j).[2] In exchange, all Native land claims in Alaska based on aboriginal occupancy were permanently extinguished. *See* § 1603. The ANCSA did not convey land or money directly to individual Alaskans but instead provided for distributions to be made to corporations that reflected preexisting Native organizations. § 1603. Congress created Alaska Native Corporations ("ANCs") to manage and develop the assets rather than vesting assets in existing tribal governments, a route taken with Indian Reservations in the lower forty-eight states.  *See* Indian Reorganization Act of 1934 (IRA), ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 *et seq.*).

The ANCSA mandated two tiers of ANCs. First, it mandated the incorporation of twelve Alaska Native regional corporations. 43 U.S.C. §1606 (stating that "[f]or purposes of this chapter, the State of Alaska shall be divided by the Secretary within one year after December 18, 1971, into twelve geographic regions, with each region composed as far as practicable of Natives having a common heritage and sharing common interests."). The second tier of ANCs were "village corporations." *See* § 1607. The Native residents of each native village were required to organize as a for-profit business or nonprofit corporation under the laws of Alaska before the Native village could receive patents to lands or benefits under ANCSA. § 1607. A village corporation under ANCSA is "organized under the laws of the State of Alaska as a business for profit or nonprofit corporation to hold, invest, manage and/or distribute lands, property, funds, and other rights and assets for and on behalf of a Native village[.]" § 1602(j). The initial articles

---

[1] The Court has gone over these facts at earlier stages of litigation. (Op. on Mot. to Dism. I, ECF No. 36; Op. on Mot. to Dism. II, ECF No. 59). Those recitations are adopted here as well.

[2] As the United States correctly points out, the claims in this case are not based upon Alaska Land Transfer Acceleration Act of 2004 (43 U.S.C. § 1602(e)) or the ANCSA (43 U.S.C. § 1601, *et seq*.). (Def.'s Resp. at 10, ECF No. 88). Discussion of those statutes is strictly for illustrative purposes and not for analysis of Cully's claims.

of incorporation for each village corporation were subject to the approval of the Regional Corporation for the region in which the village is located. § 1607. Each village corporation is entitled to select an allotment of land in and around the village it serves. § 1611. Plaintiff in this case, Cully, is one such village corporation.

### B.   Land at Point Lay and Lease with North Slope Borough

Cully is the village corporation for the Native Village of Point Lay. (Sec. Am. Compl. at 1; Pl.'s Mot. Ex. 3, ECF No. 81-3). Point Lay is not incorporated as a municipality under state law; it is an unincorporated community in the Borough. Official Website of the North Slope Borough, *Point Lay*, http://www.north-slope.org/our-communities/point-lay (last visited March 12, 2022). The Native Village of Point Lay is a federally recognized tribe within the Arctic Slope Regional Corporation. Arctic Slope Native Association, *Point Lay*, https://arcticslope.org/about/communities/point-lay/ (last visited April 12, 2022). It lays within the remote Artic on the Chukchi Sea in northwestern Alaska, about 180 miles southwest of the community formerly known as Barrow, now renamed Utqiagvik. A. Himes-Cornell, et al., *Community Profiles for North Pacific Fisheries – Alaska – Technical Memorandum NMFS-AFSC-259*, National Oceanic and Atmospheric Administration, Nov. 2013, at 195, 199. The coastal landscape in that area is characterized by bays and inlets, lagoons with barrier islands, gravel and sandy shores, basins, shallow lakes, and deltas. *Id.* at 5. The largest coastal lagoon system in Artic Alaska which abuts the village hosts a large summer concentration of beluga whale, walrus, seal, and Brant geese. *Id.* at 195. In many respects, Point Lay is a subsistence community relying on the harvest of whales, caribou, waterfowl, fish, and formerly seals, walrus, and polar bears. *Id.* at 207, 217–18.

Pursuant to a series of public land orders, the United States withdrew public lands in and near Point Lay for military purposes. (Sec. Am. Compl. at 2). The site was previously used as a Distant Early Warning ("DEW") location, which is a network of radar and communication installations in, among other places, Alaska; it lies immediately adjacent to the Native Village of Point Lay. (*Id.*).  Though the radar stations were deactivated in 1994, the site of the DEW facility remained contaminated with hazardous material. (*Id.* at 3).

Since the 1980s, the Air Force and the NSB, the Alaskan municipal body for the North Slope, have executed several agreements for the Borough's use of facilities at Point Lay. In 1996, the Borough entered a 5-year lease for the airstrip at the DEW Site. (Sec. Am. Compl. at 2). In 2000, Cully formed an interagency planning group with NSB, the Air Force, the Bureau of Land Management ("BLM"), the Federal Aviation Administration ("FAA"), and the Arctic Slope Regional Native Corporation to discuss issues surrounding any potential land transfer and airstrip improvements. (*See* Pl.'s Mot. Ex. 9 at 1). The NSB and Cully pursued funding through the FAA for runway improvements at the Point Lay airstrip; per the Air Force, the FAA requires a minimum 20-year lease of the property to a non-federal before authorizing funds for airfield improvements. (Pl.'s Mot. Ex. 10 (2002 Letter from USAF Commander Chamberlain to Senator Ted Stevens)).

On May 23, 2005, the Air Force and the NSB executed a renewed lease for 25 years, beginning on November 1, 2004 and concluding on October 31, 2029. (Def.'s Mot. Appendix ("A__) at 4 (Lease excerpt, ¶ 1.0), A42 (*Cully Corp. v. AECOM, Inc.*, No. 2BA-13-00214 CI,

Alaska Super. Ct., Sept. 18, 2015) (*AECOM* Decision at 2)). The Lease encompasses thirteen facilities, notably including the Vehicle Maintenance Shop (garage), Air Freight Terminal (hangar), and Warehouse Supply and Equipment Base (warehouse), identified respectively as buildings 2, 3, and 4 (collectively referred to here as "the Buildings"). (Def.'s Mot. A24 (Lease. Exhibit A – Description of Premises); A42 (*AECOM* Decision at 2)). The Borough's use of the thirteen facilities includes storage, emergency shelter, administrative office, and workshop space. (Def.'s Mot. A6 (Lease, ¶ 6.0), A42 (*AECOM* Decision at 2)). In lieu of paying rent, the NSB maintains and manages the property and premises, insures them, and provides utilities, fire service, and police service. (Def.'s Mot. A5, A11–12, A15–16 (Lease, ¶ 4.1, ¶ 11, ¶ 15, ¶ 18); A42 (*AECOM* Decision at 2)). The Borough is obligated to pay all property taxes on the premises. (Def.'s Mot. A7 (Lease ¶ 8.0)). The lease authorized the Air Force to make "outgrants" consisting of "uses, easements, and rights-of-way" to third parties that did not interfere with the Borough's use. (*Id.*).

### C. Remediation and Purported Transfer

In January 2005, Cully learned that the Air Force planned to demolish the Buildings as part of a decontamination project. (Def.'s Mot. at 4; Sec. Am. Compl. at 4). With the ultimate goal to take possession of those Buildings, Cully wished to maintain rather than demolish them and learned that transfer would be dependent on the cleanup of the garage. (Sec. Am. Compl. at 4). Because the garage was under lease to the Borough, Cully needed an outgrant to begin remediation efforts. (*See id.* at 5–6; Def.'s Mot. at 5). In March 2005, Air Force officials sought funding to remediate the garage subfloor due to contamination. (Sec. Am. Compl. at 4). Cully passed a resolution to support the lease from the Air Force to NSB in order to secure FAA funding to upgrade the gravel airstrip. (*Id.* at 5). In its resolution for renovation of the runway, Cully agreed that it would receive the site and reconvey the runway portion to the Borough for operation of the airport. (Pl.'s Mot. Ex. 9, ECF No. 81-9).

The Air Force sought to effectuate transfer of the buildings. On May 11, 2005, an email communication within the Air Force indicated that General Services Administration ("GSA") approved the donation of the buildings to Cully. (Pl.'s Mot. Ex. 22, ECF No. 82-2). The email specifically stated that the Air Force was "able to get [GSA] to approve the donation without going through [the GSA's] usual process[,]" and indicated that "[t]his is good to know for future facilities going to Native corporations, as well as the land." (*Id.*).

On June 21, 2005, the remedial project manager emailed Cully regarding a license to begin remediation work, stating:

> If you guys do sign the license, I feel strongly that we can make the building transfer happen . . . unfortunately we can't guarantee it. For example, it would be against the law for us to 'trade' the labor involved in removing the soil for the value of the building. [W]e are very motivated to give you the building.

(Pl.'s Mot. Ex. 23, ECF No. 82-3). On June 30, 2005, the project manager emailed Cully again, stating: ". . . I've mentioned over the phone, any work done under the garage is being done at Cully's own risk. In other words, we can't promise you the building as a result of the work you do." (*Id.*). On July 7, 2005, the Air Force sent a letter to Cully affirming that "[t]he decision to

cancel demolition as planned [was] contingent upon Cully Corporation signing the attached license agreement with 611 ASG and Cully Corporation completing the soil removal activities," but it did not mention a property transfer. (Def.'s Mot. at 6). On July 21, 2005, the Air Force granted Cully a license to enter the garage and decontaminate the soil therein. (Sec. Am. Compl. at 6; Pl.'s Mot. Ex. 24, ECF No. 82-4).

Cully cites three documents as effectuating the transfer of property: (1) a Facility Disposal Form; (2) Form DD-1354 "Transfer and Acceptance of Military Real Property"; and (3) the Letter of Transfer. (Sec. Am. Compl. Exs. 3 (ECF No. 42-3), 4 (ECF No. 42-4), and 5 (ECF No. 42-5)). Once remediation was complete and after communication between Cully and the Air Force, on November 8, 2005, the Air Force issued a Facility Disposal form for the Buildings which stated that "[t]he facilities are no longer utilized and are excess to [Air Force] requirements, very poor condition and uneconomical to maintain. Recommend disposal by donation." (*Id.* Ex. 3). The value of each building was listed as "$0.00." (*Id.*). This form indicated that on November 8, 2005, the Facilities Board recommended approval of the plan to donate the Buildings to Cully. (*Id.*).

On November 10, 2005, the Air Force issued Form DD-1354, entitled "Transfer And Acceptance Of Military Real Property." (*Id.* Ex. 4). This form stated that the Buildings were "to be donated to Cully Corp 'as is' and 'where is'" at a cost of "$0.00." (*Id.*). On March 10, 2006, the USAF sent Cully both the form DD-1354 and an unexecuted copy of the Transfer Letter which purported to transfer the relevant Buildings to Cully pursuant to 41 C.F.R. § 102-75.990. (*Id.* Ex. 5). On March 27, 2006, the letter was signed by Colonel Joseph Skaja on behalf of the Air Force. (*Id.*).

Despite these forms purporting to transfer the Buildings to Cully, as well as the myriad communications between the Air Force confirming that transfer was being effectuated, the Buildings were never removed from the NSB Lease. (Def.'s Mot. A46 (*AECOM* Decision at 6), A40 (March 6, 2013 letter), A55–58 (Laura Keiser Depo, Excerpt)). The Air Force failed to notify Cully of its inaction. Years passed before this became problematic for Cully.

### D. Third-Party Use of Buildings

The premises leased to the Borough were subject to existing "uses, easements, and rights-of-way ('outgrants')." (Def.'s Mot. A4 (Lease ¶ 2.1)). As previously stated, the Lease authorizes the Air Force (the Lessor) to make additional "outgrants," provided such outgrants are not "inconsistent with" the NSB's "use of the [p]remises under [the] Lease." (Def.'s Mot. A4 (Lease ¶ 2.1), A44-45 (*AECOM* Decision at 4-5)). Under that provision, in 2011, the Air Force awarded a third-party, AECOM, Inc. ("AECOM"), a contract to remove a landfill located at Point Lay. (Def.'s Mot. A42 (*AECOM* Decision at 2); Sec. Am. Compl. at 6). Incident to that project, AECOM needed to store equipment during the winter months of 2012–2013. (*Id.*).

In October 2012, Vikki Gilmore, a realty specialist employed with the 611th Civil Engineer Squadron of the Air Force, notified AECOM that it had permission to store heavy equipment and hazardous waste in the hangar, which was still under Lease to the NSB. (Def.'s Mot. A73–74, A75–78 (Gilmore Depo.), A42 (*AECOM* Decision at 2), A65 (Jan. 22, 2013

5

email)). After learning of this arrangement, Cully sent AECOM a letter objecting to the contractor's receipt of that permission, stating:

> We understand that you were told that AECOM may store equipment at the Point Lay facilities by Vickie Gilmore of the 611th [Civil Engineer Squadron of the Air Force] and perhaps someone at the North Slope Borough.
>
> We believe that Ms. Gilmore misspoke, and may not have been aware of the fact that the Air Force in fact transferred ownership in 2006 of the facilities at the Point Lay Airport, that is all three buildings, to Cully Corporation.

(Def.'s Mot. A48). In the same letter, Cully demanded payment of rent for use of the hangar. (*Id.*). Cully has never received rent or lease payments for the three buildings. (Def.'s Mot. A50, A54 (Awalin Depo.)).

On March 6, 2013, Air Force Colonel Robyn Burk sent Cully a letter that stated, in relevant part:

> The Air Force remains the owner of all lands and buildings at Point Lay LRRS and the North Slope Borough has a leasehold interest in facilities 2, 3 and 4. A Letter of Transfer dated 27 March 2006 and signed by the 611th Air Support Group Commander purported to transfer facilities 2, 3 and 4 to Cully Corporation. That letter cites an authority for transfer of government property to public bodies. As an Alaska for-profit corporation, Cully Corporation is not a public body. The Air Force has therefore determined that the Letter of Transfer was not authorized and is not effective.

(Def.'s Mot. A40). On April 17, 2013, Cully responded that the transfer letter was valid and enforceable. (Sec. Am. Compl. Ex. 9). Faced with few options, litigation in state court ensued.

### E. *Cully Corporation v. AECOM Litigation*

Once AECOM refused to pay rent or evacuate the hangar, Cully initiated litigation before the Alaska Superior Court, Second Judicial District at Barrow, Case No. 2BA-13-00214 CI. (*See* Def.'s Mot. A41 (*AECOM* Decision at 1)). There, Cully asserted claims for trespass and unjust enrichment. After completion of discovery in 2014, AECOM and Cully filed cross-motions for summary judgment. (Def.'s Mot A42 (*AECOM* Decision at 2)). On September 18, 2015, the Alaska Superior Court granted judgment for AECOM. (Def.'s Mot. A41, A47 (*AECOM* Decision at 1, 7)).

AECOM presented two arguments to the Alaska Superior Court. First, AECOM argued that Cully lacked standing to sue because the March 6, 2006 Letter of Transfer was invalid; AECOM also argued that Cully could not establish possession of the hangar because Cully's interest is subject to the NSB Lease. (Def.'s Mot. A43 (*AECOM* Decision at 3)). The Alaska Superior Court declined to reach the first issue as to the validity of the Letter of Transfer, deciding that issue would have required the appearance of the Air Force as an indispensable party. (*Id.*). Instead, the court determined that AECOM's second theory was dispositive, and noted that, for purposes of the motion, "the Court assumes the Letter of Transfer was valid in

conveying the Air Force's interest to Cully." (*Id.* at n.17). The crux of the Alaska Superior Court's decision was "whether Cully's interest is subject to the Lease, thereby precluding Cully from having possession of the Hangar." (*Id.*).

In deciding this question, the Alaska Superior Court interpreted the Lease using its plain language. (Def.'s Mot. A44 (*AECOM* Decision at 4)). The court stated that, as a general rule of property law, a lease confers the right of possession and that a "lessee has exclusive possession and has legal control of leased property and premises." (*Id.* at n.22 (citing *Prudential Ins. Co. of America v. United States*, 801 F.2d 1295, 1299 (Fed. Cir. 1986)). The Alaska Superior Court iterated that, "[o]nce a lessor has conveyed its present possessory interest to a lessee, the same interest cannot be conveyed to a third party." (Def.'s Mot. A44 (*AECOM* Decision at 4)). Ultimately, the court concluded that pursuant to the Lease, the Air Force conferred exclusive possession of the hangar to the NSB for twenty-five years. Because the same interest could not also be conveyed to Cully, the court held that the Letter of Transfer, at most, conveyed a reversionary interest to Cully that would be subject to the Lease. (Def.'s Mot. A45 (*AECOM* Decision at 5)).

In reaching its conclusion, the court found that "no evidence has been offered showing that the Air Force and Borough modified or amended the Lease." (Def.'s Mot. A46 (*AECOM* Decision at 6)). The Alaska Superior Court specifically concluded:

> AECOM has established, as described above, that the Lease conveyed possession of the Hangar to the Borough for a term of 25 years. The Lease was executed and recorded over one year before the Letter of Transfer, which Cully points to as giving it possession of the Hanger [sic]. Because Cully did not have possession of the Hangar at the time of the alleged injury as a matter of law, it cannot maintain its trespass claim. Cully's claim of unjust enrichment likewise requires possession and fails for the same reasons.

(Def.'s Mot. A47 (*AECOM* Decision at 7)). Harpooned by defeat and still hunting relief, Cully brought its claims before this Court on March 5, 2019. (ECF No. 1).

## II.    Discussion

Cully brings two causes of action against the United States, asserting (1) a Fifth Amendment takings claim; and (2) a quantum meruit claim. (Sec. Am. Compl. at 9–11). Cully bases its takings claim on the theory that Air Force transferred the buildings to it in March 2006 and, by ousting Cully from the property, the United States effected a taking without providing just compensation as mandated by the Fifth Amendment to the Constitution. (Sec. Am. Compl. at 9–10). Concerning its quantum meruit claim, Cully contends that it reasonably relied on the United States' promises and assurances in remediating the soil and accepting the Buildings and that the United States benefitted from Cully's reliance. (Sec. Am. Compl. 10–11). Based on costs associated with that remediation, Cully claims it is entitled, in quantum meruit, to monetary relief for the benefits conferred on, and accepted by, the United States. (*Id.*).

Cully moves for summary judgment as to its takings claim. (*See* Pl.'s Mot.). The United States cross-moves for summary judgment on both of Cully's claims. It alleges that Cully's

takings claim fails because Cully did not hold a cognizable title to the property and that its quantum meruit claim must fail for the same reasons as an alternative claim. (*See* Def.'s Mot.). The Court ultimately finds that Cully held a reversionary property interest in the Buildings. Whether the United States committed a taking of that property interest is a different issue. Further, Cully's quantum meruit claim is based on the remediation of the soil, not an interest in the buildings; this is not adequately addressed in the United States' motion. For the reasons outlined below, summary judgment is inappropriate on either claim.

### A. Standard of Review

The Court may grant summary judgment if the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine factual dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A party seeking to establish a genuine dispute of material fact must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations [ ], admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A).

While "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), summary judgment may still be granted when the party opposing the motion submits evidence that "is merely colorable . . . or is not significantly probative." *Anderson*, 477 U.S. at 251 (internal citation omitted). Courts may only grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita, Elec. Indus. Co., Ltd. v. United States*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

### B. Takings Claim

#### i. <u>Issue Preclusion</u>

Because its final ruling is heavily dependent on the doctrine of issue preclusion, the Court begins by analyzing whether Cully's claims are limited by the prior decision of the Alaska Superior Court. The United States argues that Cully is precluded from asserting ownership of the Buildings based on the Alaska Superior Court's decision in *Cully Corp. v. AECOM*. (Def.'s Mot. at 14–18). Specifically, the United States cites the Alaska Superior Court's statement that "the Letter of Transfer, at most, conveyed a reversionary interest to Cully that is subject to the Lease." (Def.'s Mot. A45 (*AECOM* Decision at 5)). Cully counters that issue preclusion is inapplicable in this case and maintains that the Alaska court's order is not preclusive, but evidentiary at best. (Pl.'s Resp. at 14, ECF No. 87). The Court finds that the elements of issue preclusion do apply, therefore Cully's claims cannot be based on the United States taking of a possessory interest in the Buildings. However, because the Alaska Superior Court's decision

could not extend to the validity of the transfer, both because it lacked jurisdiction to do so and because the Air Force was not joined as an indispensable party, further analysis is required.

The doctrine of issue preclusion, or collateral estoppel, "protects the finality of judgments by precluding relitigation in a second suit of claims actually litigated and determined in the first suit." *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (internal quotations omitted). Issue preclusion "does not include any requirement that the claim (or cause of action) in the first and second suits be the same. Rather, application of issue preclusion centers around whether an issue of law or fact has been previously litigated." *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994). A party seeking to apply the doctrine of issue preclusion must show: "(1) the previous determination was necessary to the decision; (2) the identical issue was previously litigated; (3) the issue was actually decided in a decision that was final, valid, and on the merits; and (4) the party being precluded from relitigating the issue was adequately represented in the previous action." *United Access Techs., LLC v. Centurytel Broadband Servs. LLC*, 778 F.3d 1327, 1331 (Fed. Cir. 2015). "[T]he party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment." *Id.* (internal citations and quotations omitted).

In this action, the United States argues that collateral estoppel bars re-litigation of whether Cully has the right to possess the buildings. (Def.'s Mot. at 15). The state court did not analyze whether the transfer from the Air Force was valid, nor could it. (Def.'s Mot. A43 ("[T]he Court declines to address whether the Letter of Transfer is invalid.")). It instead conducted its analysis assuming that the transfer was valid, but still found that any interest Cully had was subject to the NSB Lease, thereby preventing Cully's possession of the hangar.[3] (*Id.*). The Alaska Superior Court held that, pursuant to the plain language of the Lease, the Borough, not Cully, had "exclusive possession" of the hangar for 25 years, and any authorization of future outgrants had no effect on NSB's possession. (Def.'s Mot. at A41–45 (*AECOM* Decision)). The Alaska court also found that, even if valid, the Letter of Transfer did not modify or amend the Lease (*Id.* at 45–46 (*AECOM* Decision at 5–6)). The Alaska court granted judgment in favor of AECOM because, without exclusive possession, Cully could not maintain its trespass claims. (*Id.* at 47 (*AECOM* Decision at 7).

Because possession of the hangar was germane to the Alaska state court's decision to grant judgment to AECOM, the previous determination is necessary for this decision. Further, though the ultimate claims of the cases are not identical, defining Cully's interest in the Buildings involves identical analysis in both cases. Thus, the Court finds that whether Cully had a possessory interest in the Buildings was a previously litigated issue. The nature of Cully's property interest is vital in determining whether its takings claim is cognizable. As to whether the state court's decision was final, it indisputably was. When a court resolves a motion for summary judgment it results in a judgment on the merits. *See Kunkes v. United States*, 78 F.3d 1549, 1550

---

[3] The Court recognizes that the only building at issue in the Alaska Superior Court case was the hangar. Cully has not argued that the Alaska court's decision cannot be extended to the other buildings. However, should this Court reach a different conclusion regarding the warehouse or garage, it could produce inequitable results that run counter to the state court ruling. Therefore, the Court applies that finding to each of the three buildings.

n.2 (Fed. Cir. 1996) ("Unlike a Rule 12(b)(6) motion, a summary judgment motion does not simply test the sufficiency of the complaint; it involves an examination of material outside the complaint, and determines whether on the undisputed facts presented in that material, the movant is entitled to judgment as a matter of law . . .. Accordingly, for purposes of the appeal we treat the matter not as a dismissal but as an entry of judgment . . .."); *Indium Corp. of Am. v. Semi–Alloys, Inc.*, 781 F.2d 879, 883 (Fed. Cir. 1985) (noting that a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure "seeks a judgment on the merits of a case"). At this point, the Alaska court's judgment is final, valid, and on the merits. Finally, because Cully is the named Plaintiff in both cases, the Court finds that Cully's interests were adequately represented in the previous action. The United States has therefore met its burden to show, with clarity and certainty, that Cully's possessory property interest was adjudicated by the Alaska court's judgment.

Despite the United States' contention, though, the Alaska court's holding does not mean that Cully does not have any property interest whatsoever. (*See* Def.'s Mot. at 15). In fact, that opinion clearly states that the Letter of Transfer may have conveyed a reversionary property interest. (Def.'s Mot. A45 (*AECOM* Decision at 5)). The Alaska Superior Court has merely determined the ceiling of Cully's possible interests, but the floor is an issue reserved for this Court. Assuming that transfer is valid, whether Cully possesses a reversionary interest and whether that interest is cognizable for the purposes of a takings claim must be further analyzed.

    ii.   <u>Statute of Limitations</u>

The Court previously decided at the Motion to Dismiss stage that Cully's takings claim was not barred by the statute of limitations. (Sec. Op. Denying Mot. to Dism., ECF No. 59). That said, the United States renews its argument at this stage based on evidence revealed in discovery that it believes gives rise to earlier accrual of the statute of limitations. The United States argues that the takings claim is time-barred because it began to accrue when Cully was made aware of AECOM's presence in the hanger, more than six years before the date on which this suit was filed. (Def.'s Mot. at 6). Cully asserts that it was effectively ousted from the garage, hangar, and warehouse by the letter of March 6, 2013, because that letter insisted that the transfer of the buildings to Cully was void or that, alternatively, Cully lacked exclusive possession. (Pl.'s Mot. at 39). Thus, Cully responds that the claim would not have accrued until the Government put Cully on notice on March 6, 2013, and that this suit, instituted on March 5, 2019, is thus timely. (*Id.*). Again, the Court agrees with Cully.

A plaintiff has six years to file a claim over which the Court of Federal Claims has jurisdiction, or else the claim is barred by the statute of limitations. 28 U.S.C. § 2501. The six-year statute of limitations is jurisdictional and is not subject to equitable tolling. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136–39 (2008). The burden of establishing subject matter jurisdiction rests with the plaintiff, who must do so by a preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

Physical taking claims "accrue[] when the scope of what is taken is fixed . . . and the plaintiff knew or should have known of the acts that fixed the government's alleged liability." *Katzin v. United States*, 908 F.3d 1350, 1358 (Fed. Cir. 2018). Stated differently,

accrual begins "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *FloorPro, Inc. v. United States*, 680 F.3d 1377, 1380 (Fed. Cir. 2012). In *Peterson v. United States*, the Court held that the cause of action for a taking accrued not when an agreement between the government and a third party was reached, but when the government's conduct seemed to renounce that agreement. 140 Fed. Cl. 1, 9 (2018); *see also Langenegger v. United States*, 756 F.2d 1565, 1571 (Fed. Cir. 1985) ("When considering a possible taking, the focus is not on the acts of others, but on whether sufficient direct and substantial United States involvement exists.") (emphasis removed).

The United States' successful argument regarding issue preclusion creates a paradox impeding the success of its statute of limitations argument. In considering when the statute of limitations would begin to run, the Court must determine when Cully's possible claims accrued. Because of the Alaska state court's ruling that AECOM did not interfere with Cully's property rights, Cully's claims could not have accrued until ouster and interference with its remaining possible interest. Stated differently, as the Alaska court held, and as this Court follows, AECOM's presence in the hangar did not interfere with Cully's rights, thus Cully's *knowledge* of AECOM's presence could not give rise to Cully's claims. Assuming Cully's claim is cognizable, it was not until the United States' direct interference with Cully's future, reversionary rights that Cully's claims began to accrue. As the Court previously held, using the date of that letter as a marker means that Cully's claims did not begin to accrue until at least March 6, 2013. (*See* Pl.'s Mot. Ex. 46). Cully's original complaint was filed on March 5, 2019, 5 years and 364 days after the date of that letter. Therefore, Cully's takings claim is not barred by the statute of limitations.

### iii.   Validity of Transfer

The United States' letter informing Cully that transfer of the buildings was not valid precipitated Cully's claims before this Court. The United States argues here that, because the transfer was not valid, a taking could not have occurred. The United States contends that "Cully is not a 'public body' within the meaning of applicable regulation, which means that no valid transfer of the property could occur." (Def.'s Resp. at 4, 12). Cully counters that, by virtue of being an Alaskan Native Corporation, it is necessarily a public body. (Pl.'s Reply at 26, ECF No. 93). To make that determination, the Court must analyze relevant regulations and statutory schemes that allow the United States to donate property.

The starting point for interpreting a statute is the language of the statute itself. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.* "To ascertain whether Congress had an intention on the precise question at issue, [Courts] employ the 'traditional tools of statutory construction.'" *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). When interpreting a statute or regulation, the Court starts with its plain language. *Barela v. Shinseki*, 584 F.3d 1379, 1382–83 (Fed. Cir. 2009) (citation omitted). That language is not interpreted in a vacuum and the Court "must consider not only the bare meaning of each word but also the placement and purpose of the language within the statutory scheme." *Id.* at 1383 (citation omitted). A statute's meaning, regardless of whether the language is plain or not, depends on the context. *Id.* (citation omitted). While the Court may look to context to understand the meaning of a statute, it does not look beyond "the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

In this case, whether transfer of the Buildings was valid depends on whether Cully is a "public body" for purposes of the Federal Regulations governing the transfer or donation of real property. The Court begins by addressing the legal status of Alaska Native regional and village corporations, as they are uniquely situated in the law. In its past cases "address[ing] the unique circumstances of Alaska and its indigenous population," the Supreme Court has repeatedly recognized "[t]he 'simple truth' . . . is that 'Alaska is often the exception, not the rule.'" *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S.Ct. 2434, 2438 (2021) (quoting *Sturgeon v. Frost*, 577 U.S. at 440).

Attributing to their distinct status, ANCs are required to meet various requirements. The ANCSA and its implementing regulations require village corporations to have "on April 1, 1970, an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life style . . .; [t]he Village must not be modern and urban in character; and . . . [i]n the case of unlisted Villages, a majority of the residents must be Native . . .." 43 C.F.R. § 2651.2(b)(2), (3) & (4). For many legal purposes, Alaskan villages are primarily treated as Indian tribes. The Supreme Court has long held that statutes should be construed liberally in favor of Indian tribes, with ambiguous provisions interpreted to their benefit. *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164 (1973); *Choate v. Trapp*, 224 U.S. 665, 675 (1912). The Indian Self-Determination and Education Assistance Act ("ISDA") defines an "Indian tribe" as

> [1] any Indian tribe, band, nation, or other organized group or community, [2] including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688), [3] which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

25 U.S.C. § 5304(e).

ANCs, such as Cully, are for-profit corporations incorporated under Alaska state law that Congress created just four years before ISDA. *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. at 2449. "They are not at all the type of entities normally considered for a government-to-government relationship with the United States." *Id.* citing 25 C.F.R § 83.4 (1994) ("The Department will not acknowledge," *i.e.*, federally recognize, "[a]n association, organization, corporation, or entity of any character formed in recent times unless the entity has only changed form by recently incorporating or otherwise formalizing its existing politically autonomous community"). The United States does not contest that Cully, as an Alaska village corporation, is an ANC and, therefore, an "Indian tribe," under the holding in *Yellen*. (Def.'s Resp. at 14, citing 141 S. Ct. at 2438). Instead, the United States maintains that the regulations allowing the donation of real property do not provide for Indian Tribes, thereby also excluding ANCs. This argument would require the Court to ignore distinct differences between ANCs and Indian tribes.

Turning to the regulations at issue, federal agencies may transfer or donate property under 41 C.F.R. § 102-75.990.[4] Pursuant to that regulation:

> [A]ny Federal agency having control of real property that has no commercial value or for which the estimated cost of continued care and handling exceeds the estimated proceeds from its sale, may—
>
> (a) Abandon or destroy Government-owned improvements and related personal property located on privately-owned land;
>
> (b) Destroy Government-owned improvements and related personal property located on Government-owned land (abandonment of such property is not authorized); or
>
> (c) Donate to public bodies any Government-owned real property (land and/or improvements and related personal property), or interests therein

41 C.F.R. § 102-75.990.

As it relates to the transfer of real property, the term "public body" is further defined to mean "any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, or any political subdivision, agency, or instrumentality of the foregoing." 41 C.F.R. § 102-71.20. This is in contrast with the subchapter related to donating personal property, which defines a "public body" as "any department, agency, special purpose district, or other instrumentality of a State or local government; *any Indian tribe*; or any agency of the Federal Government." 41 C.F.R. § 102-37.560 (emphasis added).

The Supreme Court has observed that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up); *see also Heino v. Shinseki*, 683 F.3d 1372, 1379 (Fed. Cir. 2012) (endorsing the *Russello* principle). When the same term is defined and used differently in the same title, the Court assumes that it is intentional and considers the purpose of the eliminated language and which definition is broader. A basic reading of the two definitions would indicate an intention for states, and instrumentalities thereof, to have more direct control over the real property located in its bounds. In contrast, the regulation governing personal property indicates that transfer is limited to smaller, similarly situated groups; it limits donations to those instrumentalities and specific groups rather than generally to states.

As the United States points out, the Supreme Court has held that Indian tribes are "distinct, independent political communities, retaining their own natural rights." *See Worcester v. State of Georgia*, 31 U.S. 515, 559 (1832); *see also Montana v. United States*, 450 U.S. 1245,

---

[4] There is no argument or evidence that the implementing agency has interpreted the language at issue in this regulation. Therefore the Court has no reason to consider deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

566 (1981) (Indian tribes retain inherent, sovereign power). Thus, as the United States claims, it is in this sense that Cully, as a sovereign "Indian tribe," does not meet the definition of a public body under the regulations. (Def.'s Resp. at 17). Although ANCs classify as Indian tribes in many provisions of the law, the United States fails to recognize that there are significant differences between ANCs and Indian tribes within the lower 48 states.

Indian tribes are sovereign entities and federal law limits the applicability of state and local law to tribal Indians on reservations. Indian tribes cannot be considered public bodies by virtue of that sovereignty. *See* Charles F. Wilkinson & John M. Volkman, *Judicial Review of Indian Treaty Abrogation: "As Long as Water Flows, or Grass Grows Upon the Earth"–How Long a Time Is That?*, 63 Calif. L. Rev. 601, 604-05 (1975) ( "[R]eservations are sanctuaries where land is not subject to taxation; where individual Indians are free of most taxes; where many state laws do not apply; and where Indian customs and traditions are supreme."). It is not lost on the Court though that ANCSA ended many of the powers and protections that American Indian Tribal Corporations otherwise enjoy. In *Alaska v. Native Village of Venetie Tribal Government*, the Supreme Court ruled that land held by Alaska Native Corporations no longer possessed the protections of "Indian country," since the lands were neither a federal set-aside nor were they under federal superintendence like Indian reservations. 522 U.S. 520, 532 (1998). Further, the corporations have specific procedures to follow as provided by ANCSA, but they are also incorporated under State of Alaska law and must follow state corporation law. *See* 43 U.S.C. § 1607(a); *see also*, AS 10.06.960-.961 (providing that corporations organized under ANCSA are subject to corporation's code provisions, with specified overriding exceptions). While the ANCSA approach is not without benefit, Alaska Native tribes lost powers of sovereignty in exchange for clear title land. This stark difference was lightly mentioned in *Yellen v. Confederated Tribes of Chehalis Reservation*, where the Supreme Court held that, while ANCs are not federally recognized tribes in a sovereign political sense, ANCs are Indian tribes under the plain definition in ISDA. 141 S. Ct. at 2449. It is that stark difference in "sovereignty" that distinguishes ANCs and Indian Tribes.

Acknowledging that ANCs that Indian tribes do, the Court turns back to whether Cully could classify as a public body. There is only one category an ANC could fit into under the relevant regulations—the key question is whether ANCs classify as "political subdivisions."[5] The term is not defined in the relevant regulations governing the donation of real property (41 C.F.R. § 102-71.20) or personal property (41 C.F.R. § 102-37.560). Therefore, the Court looks to several sources, including dictionary definitions and Congress's definition of "political subdivision" in other statutory schemes. A political subdivision is "[a] division of a state that

---

[5] The Court acknowledges that this is not an argument raised by either party. However, courts are not bound to accept the parties' legal theories as to questions of law, particularly in statutory and regulatory interpretation. *See United States v. Trek Leather, Inc.*, 767 F.3d 1288, 1300 (Fed. Cir. 2014) (finding that in analyzing statutory language, the court "is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.") (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)).

exists primarily to discharge some functions of local government." Black's Law Dictionary, 10th Ed. at 1346. In other statutory schemes, Congress has defined "political subdivision" to mean virtually any local political jurisdiction immediately below the State level of government—some including city, town, borough, county, parish, district, association, or similar government entity. *See e.g.*, 33 U.S.C. § 701n; 43 U.S.C. § 1356a; 42 U.S.C. § 247b-21; 12 C.F.R. § 160.42; 49 C.F.R. § 110.20.

As stated, ANCs are different. They are not municipalities in themselves and operate quite differently. ANCs have boards of directors and shareholders. 43 U.S.C. §§ 1606(f)–(h), 1607(c). The initial ANC shareholders were exclusively Alaska Natives; each Native received one hundred shares of the regional and village corporation operating where they lived. §§ 1606(g)(1)(A), 1607(c). Regional ANCs may provide "health, education, or welfare" benefits to Native shareholders and to shareholders' family members who are Natives or Native descendants, without regard to share ownership. § 1606(r). However, under ANCSA, native villages are defined to include "any tribe, band, clan, group, *village*, *community*, *or association* in Alaska" either listed by name or determined by the Secretary of Interior to have met certain requirements. § 1602(c) (emphasis added). Though ANCs operate as corporations in form, they ostensibly appear as a local government on their face.

Because the Court does not interpret statutes and regulations in a vacuum, the Court looks to other relevant regulations in the same title. Importantly, under 41 C.F.R. § 102-75.945, the GSA's policy is to "[p]lace excess and surplus real property in productive use through interim utilization, provided, that such temporary use and occupancy do not interfere with, delay, or impede its transfer to a Federal agency or disposal." If the Court were to adopt the United States' limited definition of "public body," the resulting decision would run counter to that broad policy proclamation and limit the powers of donation. That is an impractical result.

The United States seems to take the extreme position that ANCs and Indian Tribes are unable to receive donated, excessed real property in any scenario. Other legal provisions show that this is simply incorrect. For instance,

> In connection with any compact or funding agreement executed pursuant to this subchapter or an agreement negotiated under the Tribal Self-Governance Demonstration Project . . ., upon the request of an Indian tribe, the Secretary . . . may donate to an Indian tribe title to any personal or real property found to be excess to the needs of any agency of the Department, or the General Services Administration."

25 U.S.C. § 5392. If Congress intended to exclude Indian tribes from receiving real property donations, it would not grant the Secretary of Health and Human Services the ability to donate property deemed excess by the General Services Administration. (*See* Pl.'s Mot. Ex. 22 (email from GSA representative determining the buildings were excess and could be donated to Cully)). The Court therefore finds that, for the purposes of 41 C.F.R. § 102-71.20, ANCs qualify as "political subdivisions," and thus, public bodies under the governing regulations. The Transfer documents are therefore valid to the extent a reversionary interest was transferred. The Court will further analyze what that means in relation to the NSB lease.

     iv.   <u>Takings Analysis</u>

The parties both move for summary judgment on Cully's takings claim. Cully argues that, because the transfer documents were valid and they were subsequently ousted, it is therefore entitled to just compensation. (Pl.'s Mot. at 28–36). The United States argues, on the other hand, that even assuming that the Court were to find the validity of transfer, ultimately it does not matter because Cully's property interests are not cognizable and any claim for taking is not ripe. (Def.'s Reply at 8–15, ECF No. 94). This position is starkly untenable given in the nearly the same breath the United States complains that Cully waited too long to assert its takings claim. The Court finds that Cully has shown a reversionary interest in the Buildings, but questions of fact exist as to whether a taking has occurred. Summary judgment is thus inappropriate.

The Fifth Amendment of the United States Constitution places an important limit on the government's power to take private property. *Preseault v. I.C.C.*, 494 U.S. 1, 11 (1990). As a bedrock principle of the United States Constitution, it mandates that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V. Courts analyze claims under the Fifth Amendment by determining whether a cognizable property interest exists, and, if one does, "whether the government's action amounted to a compensable taking of that interest." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1348 (Fed. Cir. 2013). A compensable taking occurs "when government action destroys state-defined property rights." *Ladd v. United States*, 630 F.3dd 1015, 1019 (Fed. Cir. 2010).

The Court employs a two-part test to determine when a government action constitutes a taking. *See Hearts Bluff Game Ranch*, *Inc. v. United States*, 669 F.3d 1326, 1329 (Fed. Cir. 2021) (citing *Acceptance Ins. Co. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2002), *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004)). Under the first step, the Court "determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *See Acceptance Ins.*, 583 F.3d 854. This step is a "threshold" matter, for if a claimant fails to demonstrate the existence of a legally cognizable property interest, the Court's task is at an end. *See Am. Pelagic Fishing*, 379 F.3d at 1373. Only when the first step is satisfied does the court determine whether that property interest was "taken." *Id.* at 1372. The plaintiff bears the burden of establishing a cognizable property interest for its takings claim. *See Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 519 n.12 (Fed. Cir. 2011).

The Court of Federal Claims has recognized reversionary interests as being compensable under federal statutory schemes. For instance, a Fifth Amendment taking occurs in a "rails to trails" case when the issuance of a certificate or notice of interim trail use authorizing recreational trail use effectively extinguishes the state property rights of reversion of the right-of-way to the fee owner. *Butler v. United States*, 139 Fed. Cl. 617, 622 (2018) (citing *Macy Elevator*, *Inc. v. United States*, 97 Fed. Cl. 708, 718 (2011)); *see also Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004) ("[A] Fifth Amendment taking occurs when, pursuant to the Trails Act, state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use." (citation omitted)). In instances such as these though, state law determines whether a plaintiff in a takings case has a compensable private property interest. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Preseault*, 494 U.S. at 24 (O'Connor, J., concurring).

There are no Alaska cases mirroring Cully's unique situation. Even so, looking to local eminent domain laws is particularly telling. Under Alaskan law, "if the court determines that the property is to be taken for a public use, and if all parties to the action do not object, the court shall appoint a master to determine the amount to be paid by the plaintiffs *to each owner or other person interested in the property* as compensation and damages by reason of the appropriation of the property." Alaska Stat. § 09.55.300 (emphasis added). This language clearly contemplates multiple interests in a property and does not explicitly limit compensation only available to those with possessory interests.

It is a well-founded tenet of property law that, when determining whether a property interest is a compensable one, courts determine whether the asserted property right is "one of the sticks in the bundle of rights that inhered in ownership of the underlying res." *Am. Pelagic Fishing*, 379 F.3d at 1381–82 (holding that because the right to use a fishing vessel in an exclusive economic zone in the Atlantic was not inherent in the appellant's ownership of the vessel, the appellant did not suffer the loss of a property interest when its fishing permit was revoked). The Alaska Supreme Court has recognized reversionary interests as being a stick in the bundle of property rights. In *Ethelbah v. Walker*, the court held that, in reference to the "bundle of property rights," it was not an abuse of discretion for the court to order that the rights to a party's pension benefits revert to a spouse. 225 P.3d 1082, 1095 (Alaska 2009).

Though case law and state-law analysis as to Alaska's position here are admittedly scant, there is a clear indication that reversionary interests are compensable under Alaskan law. Considering this and having found that transfer of the Buildings was valid to the extent a reversionary interest was transferred, Cully has established it owned cognizable property interests in the buildings and therefore survives the first prong of the analysis.

The Court turns to the second prong of the analysis but is left with questions precluding judgment for either party. "[I]f the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" *Acceptance Ins. Cos.*, *Inc. v. United States*, 583 F.3d at 854 (citations omitted). "Whether a [Fifth Amendment] taking has occurred is a question of law based on factual underpinnings." *Caquelin v. United States*, 959 F.3d 1360, 1366 (Fed. Cir. 2020). This part of the analysis is impossible to conduct based on the record before the Court. First, and most importantly, with the Court's finding that transfer was valid to the extent it grants a reversionary interest, the United States' ouster letter is now baseless. Stated differently, it is unclear whether the United States plans to—for lack of a better phrase— "continue" with that ouster should the Buildings revert to Cully. Second, whether Cully has or can incur damages from a future taking is entirely absent from the record. Therefore, the Court finds that trial is necessary to determine if a taking has, or could, occur, and judgment for either party is not warranted.

*C. Quantum meruit*

Cully pleads that it is entitled to compensation on a theory of quantum meruit. (Sec. Am. Compl. at 10–11). In support, Cully argues that it performed remediation of the contaminated soil and accepted the Buildings in good faith and reasonable reliance on the promises, assurances, Transfer Letter, DD-1354, and Facilities Disposal Form of the government. (*Id.*). Based on that reliance, Cully claims that it incurred costs and conferred significant benefits to the

United States, including relieving the government of costs that it would have otherwise incurred in demolishing the Buildings. (*Id.* at 11). The United States moves for judgment on this claim. Citing the preclusive effect of the Lease to the Borough and the Alaska Superior Court's holding, the United States argues that Cully's claim to damages on the quantum meruit claim is limited. (Def.'s Mot. at 18–19).[6] However, the United States does not elaborate on that argument. The Court denies summary judgment on those grounds.

"Quantum meruit is a 'claim or right of action for the reasonable value of services rendered.'" *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1329 (Fed. Cir. 2006) (quoting Black's Law Dictionary 1276 (8th ed. 2004)). The Federal Circuit distinguishes two types of quantum meruit claims: implied-in-law and implied-in-fact. *See Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). The Court of Federal Claims lacks jurisdiction over contracts implied in law. 28 U.S.C. § 1491(a)(1). "Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract but rather under an implied-in-fact contract." *Int'l Data Prods. Corp.*, 492 F.3d at 1325–26 (citing *United Pac. Ins. Co. v. United States*, 464 F.3d at 1329–30).

The Court of Federal Claims has jurisdiction over quantum meruit claims "when a contractor provides goods or services in good faith under an express contract that is later rescinded for invalidity." *Lee v. United States*, 895 F.3d 1363, 1366 (Fed. Cir. 2018) (internal quotations omitted). Thus, the Court's "jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Hercules Inc. v. United States*, 516 U.S. 417, 423 (1996). The two types of implied contracts differ significantly. *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998).

> An agreement implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." By contrast, an agreement implied in law is a "fiction of law" where "a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress."

*Hercules Inc.*, 516 U.S. at 424 (citations omitted) (quoting *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)).

Implied-in-fact contracts have the same requirements as express, valid contracts. *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("[T]he general requirements of a binding contract with the United States are identical for both express and implied contracts."). These general requirements are "(1) mutuality of intent to contract; (2)

---

[6] This Court previously ruled that "costs incurred after the Transfer Letter was rescinded are not recoverable in quantum meruit." (*See* ECF No. 36 at 13). This Opinion does not deviate from that holding.

consideration; and (3) lack of ambiguity in offer and acceptance." *Lewis v. United States*, 70 F.3d 597, 600 (Fed. Cir. 1995) (quoting *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990), cert. denied, 501 U.S. 1230 (1991)). "When the United States is a party, a fourth requirement is added: the government representative whose conduct is relied upon must have actual authority to bind the government in contract." *Id.* (internal quotation marks omitted).

Cully's quantum meruit claim is separate and distinct from its takings claim. That claim is based upon the performance of remediation work in 2005, the cost of which was $45,000. (Pl.'s Pre-trial Memo. at 10, ECF No. 113). While the claims are based on the same operative facts, the takings claim seeks compensation for *property*, and the quantum meruit claim seeks to recover costs of *remediation*. Thus, the United States' argument, that quantum meruit is an alternative claim that must fail for the same reasons that the takings claim, is misplaced. Because the Court has found that the transfer of a reversionary interest was valid, whether Cully can recover in quantum meruit is limited to the extent Cully believed it was performing remediation to receive a possessory interest and what interest the parties believed were being transferred. Thus, questions of fact necessitate trial on these issues. Judgment on the quantum meruit claim is therefore denied.

## III.   Conclusion

The Court finds that Cully has established a valid, reversionary interest in the property at issue; however, trial is necessary to determine whether a taking has occurred or ever could occur. Second, the Court is unable to resolve Cully's quantum meruit claim on the United States' motions. Considering the record before the Court as a whole, the Court cannot reasonably grant judgment to either party. The cross-motions for summary judgment are hereby **DENIED**. The trial set for May 9, 2022, will proceed as scheduled.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge