# In the United States Court of Federal Claims

No. 19-339C
Filed: December 28, 2022

---

**CULLY CORPORATION,**

*Plaintiff,*

**v.**

**THE UNITED STATES,**

*Defendant.*

---

*Samuel J. Fortier*, Fortier & Mikko, P.C., Anchorage, AK, for Plaintiff.

*Joseph A. Pixley* and *Bret R. Vallacher*, Trial Attorneys, *L. Misha Preheim*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with *Robin M. Richardson*, Senior Environmental Litigation Attorney for AF/JA-Operations and International Law, Environmental Law and Litigation Division, for Defendant.

## POST-TRIAL OPINION AND ORDER

**TAPP, Judge.**

The challenges of living on the Chukchi Sea cannot be overstated. Aside from extreme isolation, climate affects everything in native villages adjacent to the Chukchi's shallow waters between northwest Alaska and the eastern Siberian coastline. Relentless weather hampers the delivery of subsistent materials, accelerates the decay of manmade structures, and limits financial opportunities for residents. Each challenge is an indirect factor in this takings case involving the Native Village of Point Lay, Alaska. The disinterest of outsiders imposes additional unnecessary hardships on those American citizens whose homes border these waters. Relevant here, the reverberations of such indifference engendered this litigation and delayed resolution.

After a tumultuous journey, the Court eventually tried this takings case in Fairbanks, Alaska in the summer of 2022. Subsequent to an Amended Summary Judgment Opinion finding that Plaintiff, Cully Corporation ("Cully"), possessed an interest in the properties at issue and that a temporary taking had indeed occurred, the remaining triable issues were limited: (1) what, if any, compensation was owed to Cully; and (2) whether Cully was entitled to relief under a quantum meruit theory. The United States' behavior toward Cully is bewildering, radiating a cavalier attitude that also seems to have shaped its behavior during the events inciting this litigation. While reasonable individuals could not help but be sympathetic to Cully's plight, sympathy provides no basis for judgment. Cully's claims are tethered to some finding of wrongdoing on the part of the United States; damages stemming from wrongdoing are generally not redressable by a takings claim. "The United States Court of Federal Claims has no general

power to provide equitable relief against the Government or its officers." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011); *see also Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000) ("Except in strictly limited circumstances, *see* 28 U.S.C. § 1491(b)(2), there is no provision in the Tucker Act authorizing the Court of Federal Claims to order equitable relief."). Because of this limitation, the Court cannot afford Cully redress.

Despite its misgivings about the United States' conduct, the Court concludes that the United States is entitled to judgment. Further, the United States moves for the Court to reconsider its Amended Summary Judgment Opinion from June 2022. (ECF No. 180). The Court declines to do so.

## I.     Findings of Fact

Cully Corporation is the Village Corporation for the Native Village of Point Lay and owns approximately 90,000 acres of land. (Joint Stipulations of Fact ("JSOF") ¶ 1, ECF No. 201-1). The Native Village of Point Lay is a federally recognized tribe. (*Id.* ¶ 2). Point Lay is an unincorporated village located in the Arctic Coastal Plain, near the shore of Kasegaluk Lagoon and the Chukchi Sea; it has a population of approximately 269 residents. (*Id.* ¶ 3–4). The Native Village of Point Lay and the adjacent Long Range Radar Site ("LRRS") are inaccessible by road and can only be reached by air or water transportation. (*Id.* ¶ 5). The Point Lay LRRS facilities are located within 900 feet of the Chukchi's shore. (*Id.*). The Point Lay LRRS and the Native Village of Point Lay are within the bounds of the North Slope Borough[1] ("NSB" or "the Borough"), the Alaskan municipal body for the North Slope. (*Id.* ¶ 7).

Under several public land orders, the United States withdrew public lands in and near Point Lay for military purposes in support of national defense requirements. (JSOF ¶ 8). The Point Lay LRRS was previously used as a Distant Early Warning ("DEW") location, which is a network of radar and communication installations in, among other places, Alaska; it lies immediately adjacent to the Native Village of Point Lay. (*Id.* ¶ 6). The DEW Site was constructed in 1955 and 1956 and activated by the United States Air Force ("the Air Force") in 1957. (*Id.* ¶ 9). In 1990, long-range radar was installed and operated as a Minimally Attended Radar Installation; it was then deactivated ten years later. (*Id.*). In 1993, due to contamination caused by the DEW site, the Air Force conducted a remedial investigation/feasibility study. (*Id.* ¶ 10). Upon further investigation in 2002, the Air Force identified various areas of concern for environmental restoration of the Point Lay LRRS. (*Id.*).

Since the 1980s, the Air Force and NSB have executed multiple agreements for the Borough's use of the LRRS facilities at Point Lay. (JSOF ¶ 11). In 1996, the Borough entered a five-year lease for the airstrip at the DEW Site. (*Id.* ¶ 11). The airstrip is unpaved, built on gravel and slurry; it is an essential facility of Point Lay due to its isolation and accessibility limitations.

---

[1] An Alaskan borough is a governmental unit akin to a county. (JSOF ¶ 7).

(Trial Transcript[2] ("Tr.") Awalin, 126:23–25; Tr. Cully Counsel, 21:10–11).  In 2000, the NSB and Cully collectively pursued funding through the Federal Aviation Administration ("FAA") for runway improvements at the Point Lay airstrip as it was their understanding that the FAA required a minimum twenty-year lease of the airstrip to a non-federal entity before authorizing funds for airfield improvements. (JSOF ₱ 12). The Air Force and the NSB ultimately executed[3] Lease Number 611CES/LE05-02 ("the Lease") for a period of twenty-five years, with an effective date beginning on November 1, 2004, and ending on October 31, 2029. (PX3.004 ¶ 1; JSOF ¶ 13).

In addition to various other provisions and structures, the Lease included the three buildings subject to Cully's claims—the Vehicle Maintenance Shop (garage), Air Freight Terminal (hangar), and Warehouse Supply and Equipment Base (warehouse) (collectively referred to here as "the Buildings"). (PX3.024 (Lease Description of Premises); PX41 (Map of Buildings)). Cully passed a resolution to support the lease from the Air Force to the Borough in order to secure FAA funding to upgrade the gravel airstrip. (Sec. Am. Compl. at 5).

In approximately January 2005, the Air Force made known its plans to demolish these three Buildings as part of a decommissioning project called "Operation Clean Sweep." (Tr. Longtin, 134:6–13; Tr. Longtin, 135:15–19; Tr. Longtin, 160:24–25; Tr. Longtin, 161:1–8). In accordance with efforts necessitated by Operation Clean Sweep, the Air Force planned to demolish the garage to remove the contaminated soil beneath it. (Tr. Longtin, 144:21–25). With the ultimate goal to take possession of those Buildings, Cully wished to maintain rather than demolish them and learned that any potential transfer would be dependent on the cleanup of the garage and remediation of the soil thereunder. (Sec. Am. Compl. at 4). Before the garage could be demolished, Cully proposed to independently shoulder remediation if the Air Force "were to not demolish the building." (Tr. Longtin, 141:2–4; Tr. Longtin 145:1–3; Tr. Longtin, 161:13–18). Cully understood that this effort would benefit the Air Force by shifting the costs of remediation from the Federal Government to Cully, (Tr. Longtin, 158:1–3), as well as benefit the NSB by alleviating the area of contamination. In return, Cully would gain three storage facilities at a far lower cost than new construction given that building materials would have to be shipped by the ocean during the few months each summer that the Chukchi Sea remained unfrozen and navigable. (Tr. Michael, 255:16–19; Tr. Blue, 411:1–17)

---

[2] The Trial Transcript consists of 836 pages and is separated into four volumes located at ECF Nos. 193 (pp. 1–230), 195 (pp. 231–427), 197 (pp. 428–679), and 199 (pp. 680–836). The Court cites the Transcript using the name of the testifying witness, then the consecutive pagination and line numbers, (Tr. NAME, __: __–__).

[3] Although the lease term began in November of 2004, it was not executed until May 23, 2005. (PX3.004). This delayed execution is not explained in the record and was not elaborated on at trial.

On June 30, 2005, Mr. David Longtin[4], acting on behalf of the Air Force, e-mailed Cully's then-president, Elsie Hendryx, iterating that "any work done under the garage is being done at Cully's own risk. . . . [W]e can't promise you the building as a result of the work you do. However, if no work is done, we CAN promise you the building will be demolished." (PX6 (emphasis in original)). Mr. Longtin testified that the authority behind the potential transfer was "[n]ot me personally. I didn't have that authority." (*See* Tr. Longtin, 162:2–6; Tr. Longtin, 163:10–18). Mr. Longtin explained at trial that, at the time of remediation in 2005, Mr. Longtin was not a contracting officer and that he did not possess a contracting officer's warrant. (Tr. Longtin, 162:9–19).

The premises leased to the Borough were subject to existing "uses, easements, and rights-of-way ('outgrants')." (PX3.004 (Lease ¶ 2.1)). Thus, because the garage was still under lease to the Borough, Cully needed an outgrant to begin remediation efforts. (Sec. Am. Compl at 5–6). On July 7, 2005, Colonel Joseph Skaja[5] sent a letter to Ms. Hendryx, concerning the garage, informing her that "[t]he decision to cancel demolition as planned is contingent upon Cully Corporation signing the attached license agreement . . . and Cully [] completing the soil removal activities[,]" but the decision is silent as to the transfer of property. (PX7). On the same day, Colonel Skaja and Ms. Hendryx, acting on behalf of Cully, executed a license to permit Cully to enter the properties and remediate the soil under the garage. (PX8.012). Importantly, Colonel Skaja explained his understanding was that if Cully undertook the remediation of the garage, Cully would receive possession of the three Buildings. (Tr. Skaja, 189:19–25; Tr. Skaja, 190:1–2; Tr. Skaja, 196:23–25). However, Colonel Skaja did not personally negotiate with Ms. Hendryx, nor with any other representative of Cully, regarding such an arrangement. (Tr. Skaja, 197:2–14). In his time as the 611th Commander, Colonel Skaja was not a contracting officer and did not have a contracting officer's warrant. (Tr. Skaja, 197:22–25; Tr. Skaja 198:1–7).

For its part, Cully completed the remediation of the Air Force facilities using its local manpower and equipment. Ms. Martha Awalin is the current president of Cully; she served as the president from 1997 to 2003 and resumed that role in 2011. (Tr. Awalin, 31:9–11, 14–15; Tr. Awalin, 101:22–25). In 2005, Ms. Awalin was not employed by Cully. (Tr. Awalin, 102:3–8). Even so, she purported that Cully has records to show $45,000 in remediation costs but could not produce them at trial. (Tr. Awalin, 125:4–14).

Once remediation was complete and after communication between Cully and the Air Force, transfer of the properties was set in motion—or so it appeared. On November 8, 2005, the Air Force issued a Facility Disposal form for the Buildings which stated that "[t]he facilities are no longer utilized and are excess to [Air Force] requirements, very poor condition and

---

[4] David Longtin was a GS-11/12 civilian Air Force employee and served as remedial project manager for the LRRS cleanup from 2003 to 2006. (Tr. Longtin, 134:14–19; Tr. Longtin, 160:3–12, 16–18).

[5] Air Force Colonel Joseph Skaja, Jr. served as the Commander of the 611th Air Support Group in Alaska from 2005 to 2007, with responsibility for the closed Point Lay LRRS. (Tr. Skaja, 182:19–21; Tr. Skaja 183:1–20).

4

uneconomical to maintain. Recommend disposal by donation." (Sec. Am. Compl., Ex. 3). This form indicated that on November 8, 2005, the Facilities Board recommended approval of the plan to donate the Buildings to Cully. (*Id.*).

On November 10, 2005, the Air Force issued Form DD-1354, entitled "Transfer And Acceptance Of Military Real Property." (Sec. Am. Compl., Ex. 4). This form stated that the Buildings were "to be donated to Cully Corp 'as is' and 'where is.'" (*Id.*). A "Bullet Background Paper on Point Lay LRRS Clean Sweep" from December 2005 indicates that the Air Force had "demolished all facilities except the vehicle maintenance shop, the warehouse and hangar" and that they were "currently [in] the process [of] transferring these facilities to Cully [C]orporation." (PX11). On March 10, 2006, the Air Force sent Cully both the form DD-1354 and an unexecuted copy of a Transfer Letter that purported to transfer the relevant Buildings to Cully pursuant to 41 C.F.R. § 102-75.990.[6] (Sec. Am. Compl. Ex. 5). On March 27, 2006, the letter was signed by Colonel Skaja on behalf of the Air Force. (*Id.*). On the same date, Colonel Skaja for the Air Force and Ms. Hendryx for Cully executed the Letter of Transfer. (PX15). The disposal value of each building is listed as $0. (PX15.006). The Letter of Transfer and attachments make no mention of the Lease. (*See* PX15). At the time he signed the Letter of Transfer, Colonel Skaja stated that he was unaware of the Lease with the Borough. (Tr. Skaja, 196:10–17). Despite these documents purporting to transfer the Buildings to Cully, as well as the myriad communications between the Air Force confirming that the transfer was being effectuated, the Air Force never removed the buildings from the NSB Lease. (*See* PX20). That passivity would be pivotal in the years to come, as the Air Force failed to notify Cully of its inaction.

As previously stated, the Lease authorizes the Air Force as the Lessor to make additional "outgrants," provided such outgrants are not "inconsistent with" the NSB's "use of the [p]remises under [the] Lease." (PX3.004 (Lease ¶ 2.1)). Under that provision, in 2011, the Air

---

[6] 41 C.F.R. § 102-75.990 dictates how federal agencies may transfer or donate property. Pursuant to that regulation:

> [A]ny Federal agency having control of real property that has no commercial value or for which the estimated cost of continued care and handling exceeds the estimated proceeds from its sale, may—
>
> (a) Abandon or destroy Government-owned improvements and related personal property located on privately-owned land;
>
> (b) Destroy Government-owned improvements and related personal property located on Government-owned land (abandonment of such property is not authorized); or
>
> (c) Donate to public bodies any Government-owned real property (land and/or improvements and related personal property), or interests therein

41 C.F.R. § 102-75.990.

Force awarded a third party, AECOM, Inc. ("AECOM"), a contract to remove a landfill located at Point Lay. *See Cully Corp. v. AECOM, Inc.,* No. 2BA-13-00214 CI (Alaska Super. Ct., Sept. 18, 2015) ("*AECOM* Decision") at 2. Incidental to that project, AECOM needed to store equipment during the winter months of 2012 and early 2013. (*Id.*). In October 2012, the Air Force notified AECOM that it had permission to store heavy equipment and hazardous waste in the hangar, which was still under Lease to the NSB. (*AECOM* Decision at 2).

Related to internal workings of the Air Force regarding the transfer of the Buildings to Cully, as admitted by the United States, "the left hand did not know what the right hand was doing with respect to the lease [with NSB]." (Tr. DOJ Counsel, 23:16–17). In late 2012, questions arose within the Air Force about "who owned" and "who had rights" to the three Buildings. (*See* Tr. Burk, 559:19–23; Tr. Burk, 560:4–9). Colonel Robyn Burk's[7] staff informed her that "there was a 25-year lease and that [] was the – most important, most significant defining legal document for [the Buildings]." (Tr. Burk, 560:6–9). In an attempt to clarify ownership of the Buildings, Colonel Burk's staff prepared a "Bullet Background Paper on Point Lay LRRS Ownership And Lease Issues," dated November 16, 2012. (DX5; Tr. Burk, 596:21–25; Tr. Burk, 597:22–24). The Bullet Background paper stated, "[a] 25-year lease was issued to the North Slope Borough to use 13 facilities and to include the land facilities sit on." (DX5.1). No mention was made of the Air Force's commitment to Cully.

Amid this dispute of ownership, Ms. Awalin attempted to market and lease the three Buildings, (Tr. Awalin, 102:11–19), namely holding discussions with the United States Coast Guard. (Tr. Awalin, 103:8–16). Despite their efforts, Cully was unable to reach an agreement with the Coast Guard; this was largely due to a concurrent government sequester. [8] (Tr. Awalin, 103:17–25; Tr. Awalin, 104:1–3).

On March 6, 2013, in disregard of the executed Form DD-1354 the Air Force's 2005 Transfer Letter in favor of Cully, Air Force Colonel Robyn Burk sent Cully a letter stating:

> The Air Force remains the owner of all lands and buildings at Point Lay LRRS and the North Slope Borough has a leasehold interest in [the Buildings]. A Letter of Transfer dated 27 March 2006 and signed by the 611th Air Support Group Commander purported to transfer facilities 2, 3 and 4 to Cully Corporation. That letter cites an authority for transfer of government property to public bodies. As an Alaska for-profit corporation, Cully Corporation is not a public body. The Air Force has therefore determined that the Letter of Transfer was not authorized and is not effective. Additionally, the Air Force leased certain property at Point Lay, including [the Buildings],

---

[7] In 2009, Air Force Colonel Robyn Burk became the 611th Group Commander in Alaska; she served in that position until July 2014. (Tr. Burk, 554:24–25; Tr. Burk, 555:1–14).

[8] The Federal Government experienced a sequestration on or about March 1, 2013. *See* 78 Fed. Reg. 14,633 (Mar. 1, 2013).

> to the North Slope Borough beginning on 1 November 2004 and ending 31
> October 2029. The North Slope Borough recorded the lease on 3l May 2005.
>
> If Cully Corporation has any items stored in [the Buildings], please arrange
> for those items to be removed immediately.

(PX20). Colonel Burk testified that the purpose of this communication was to "notify[] [Cully]
that if they had property there, that they needed to go ahead and move it." (Tr. Burk, 563:19–25;
Tr. Burk, 564:1–7). The Air Force's contention here runs counter to the multi-year practice of
building donations to various Alaskan entities and would presumably nullify several transfers.
(Tr. Skaja, 185:1–9).

Cully vehemently disagreed with the Air Force's assertions of ownership. (Tr. Burk,
564:12–21). In response to Colonel Burk's letter, Ms. Awalin sent a letter to Colonel Burk dated
April 17, 2013, stating, among other things,

> We believe you are in error . . . your letter attempting to rescind the Letter of
> Transfer . . . is a nullity . . . the Air Force does not remain the owner of [the
> Buildings]. Cully is the owner of the facilities, pursuant to the USAF Letter
> of Transfer. Cully accordingly declines your request to vacate the facilities.

(DX29.1, DX29.2, DX29.4; *see also* Tr. Burk, 565:12–25; Tr. Burk, 566–567). Ms. Awalin
testified that at that point she was oblivious to the Lease and the language therein. (Tr. Awalin,
64:15–21; Tr. Awalin, 76:14–16). Ms. Awalin confirmed that, in accordance with the
contentions in her response letter, Cully continued to "declare ownership" of the Buildings after
receiving Colonel Burk's letter. (Tr. Awalin, 65:7–11). It is unclear whether the Air Force took
retaliatory action after receiving Cully's April 17, 2013 letter. (Tr. Burk, 567:6–12).

On September 30, 2013, based on the equipment stored in the hangar, Cully filed suit
against AECOM for trespass and unjust enrichment in the Superior Court for the State of Alaska
("Alaska Superior Court").[9] (*AECOM* Decision at 2). Meanwhile, Ms. Awalin pursued
discussions and negotiations with several oil companies about possibly leasing the Buildings as
part of a land-deal. (Tr. Awalin, 104:4–6). Ms. Awalin understood that various oil companies
were conducting offshore exploration in the Arctic Ocean off Point Lay in the Chukchi Sea. (Tr.
Awalin, 104:12–20). Based on this, Cully was interested in effectuating a land-use agreement
with one of the oil companies as part of a larger plan to develop Point Lay, which included a
deep-water port and an expansion of the Point Lay airstrip. (Tr. Awalin, 104:21–25; Tr. Awalin,
105:1–13). In a public meeting on November 6, 2013, Ms. Awalin informed the Point Lay
community that Cully was the lawful owner of the Buildings and that she was negotiating a land-
use agreement with Shell on that basis. (PX24; Tr. Awalin, 611:5–12).

---

[9] Because this lawsuit had some preclusive effects on this case, the Alaska Superior Court's
decision will be further detailed in the Procedural History section below.

In Ms. Awalin's experience, the oil industry does not like to deal with land issues if there is a problem—such as an encumbrance or clouded title—and will not lease properties until those issues are resolved. (Tr. Awalin, 105:14–20). Ms. Awalin testified that this Lease was "holding [Cully] hostage from owning the lands." (Tr. Awalin, 106:22–25; Tr. Awalin, 107:1–3). In 2013, Ms. Awalin made presentations to two oil companies, Shell and ConocoPhillips, but did not reach a land-use agreement with either company. (Tr. Awalin, 108:8–25; Tr. Awalin, 109:1–5). After receiving Colonel Burk's letter in 2013, Ms. Awalin continued her unsuccessful efforts to market the Buildings to the oil industry for at least three more years, "[a]ll the way till the oil industry left the exploration[,]" in 2016 or 2017. (Tr. Awalin, 102:23–25; Tr. Awalin, 108:18–22). Cully presented no documents at trial concerning its discussions with oil companies, but Ms. Awalin believes that such documents existed and were located "in [her] office in Anchorage." (Tr. Awalin, 54:22–25). In 2013, ConocoPhillips effectively stopped its permitting efforts and deferred oil exploration in the Chukchi Sea. (Tr. Lesch, 726:11–24). In 2016, Shell purportedly withdrew exploration plans in the Chukchi Sea and subsequently returned 113 leases in that area. (Tr. Lesch, 727:3–14).

Under the Lease, the Borough is required to maintain insurance on the Buildings. (PX3.012 ¶ 15). Amid litigation at the Alaskan Superior Court, Cully began to shoulder insurance on the Buildings beginning on or about June 7, 2014. (PX21; Tr. Awalin, 124:2–13). In 2015, Cully put up "no trespassing" signs on the Buildings, stating that the "[p]roperty's owned by Cully Corporation and also gave a number to call for interested parties" for leasing purposes. (Tr. Awalin, 66:18–25; Tr. Awalin, 67:1–11; Tr. Awalin, 69:2–4, 22–24; *see also* PX31). Ms. Awalin testified that Cully has never tried to sell the Buildings, nor has she received any purchase offers. (Tr. Awalin, 118:23–25; Tr. Awalin, 120:5–7). Apparently still trying to maintain the condition of the buildings, Cully repaired the garage by replacing an exterior door and fixing entryway steps in 2016. (PX35.003; Tr. Awalin, 91:8–19). Cully produced no evidence that it attempted to litigate specifics of its interest and its rights and obligations arising from transfer in conjunction with the NSB Lease.

## II.    Procedural History

Cully asserted claims for trespass and unjust enrichment against AECOM in the Alaska Superior Court. (*AECOM* Decision at 1–2). After completion of discovery, AECOM and Cully filed cross-motions for summary judgment. (*Id.* at 2). In its ruling, the Alaska Superior Court determined that, under Alaska law, Cully could not establish possession of the hangar because Cully's interest was subject to the NSB Lease. (*Id.*). That court explained that, for purposes of the motion, "the Court assumes the Letter of Transfer was valid in conveying the Air Force's interest to Cully." (*Id.* at 3). The crux of the Alaska Superior Court's decision was "whether Cully's interest is subject to the Lease, thereby precluding Cully from having possession of the Hangar." (*Id.*).

The court stated that, as a general rule of property law, a lease confers the right of possession and that a "lessee has exclusive possession and has legal control of leased property and premises." (*AECOM* Decision at 4 n.22 (citing *Prudential Ins. Co. of America v. United States*, 801 F.2d 1295, 1299 (Fed. Cir. 1986)). The Alaska Superior Court iterated that, "[o]nce a lessor has conveyed its present possessory interest to a lessee, the same interest cannot be

conveyed to a third party." (*AECOM* Decision at 4). Ultimately, the court concluded that pursuant to the Lease, the Air Force conferred exclusive possession of the hangar to the Borough for twenty-five years. Because the same interest could not also be conveyed to Cully, the court held that the Letter of Transfer, at most, conveyed a reversionary interest to Cully that would be subject to the Lease. (*Id.* at 5).

In reaching its conclusion, the state court found that "no evidence has been offered to show that the Air Force and Borough modified or amended the Lease." (*AECOM* Decision at 6). In sum, the Air Force's failure to modify its lease with the Borough after the 2005 Letter of Transfer condemned Cully's legal efforts to enforce its possessory rights. The Alaska Superior Court specifically concluded:

> AECOM has established, as described above, that the Lease conveyed possession of the Hangar to the Borough for a term of 25 years. The Lease was executed and recorded over one year before the Letter of Transfer, which Cully points to as giving it possession of the Hanger [sic]. Because Cully did not have possession of the Hangar at the time of the alleged injury as a matter of law, it cannot maintain its trespass claim. Cully's claim of unjust enrichment likewise requires possession and fails for the same reasons.

(*Id.* at 7). This Court is bound by that ruling. On September 18, 2015, the Alaska Superior Court granted judgment for AECOM. (*Id.* at 1, 7). The Borough was not a party to that suit.

On March 5, 2019, Cully filed its Complaint before this Court. (Compl., ECF No. 1).[10] Here, Cully asserts two causes of action: (1) a Fifth Amendment takings claim; and (2) a quantum meruit claim. (Sec. Am. Compl. at 9–11). Cully's takings claim is based on the theory that the Air Force legally transferred the buildings to Cully in March 2006 and, by ousting Cully from the property, the United States effected a taking without providing just compensation as mandated by the Fifth Amendment of the Constitution. (*Id.*). Concerning its quantum meruit claim, Cully contended that it reasonably relied on the United States' promises and assurances in remediating the soil and accepting the Buildings and that the United States benefitted from Cully's reliance. (*Id.* 10–11). Based on costs associated with that remediation, Cully claims it is entitled, in quantum meruit, to monetary relief for the benefits conferred upon, and accepted by, the United States. (*Id.*).

On April 14, 2022, this Court denied summary judgment for both parties; it made substantive findings about the property interest at issue, but ultimately found that factual issues remained for trial. *Cully Corp. v. United States,* 159 Fed. Cl. 427, (2022) (*Cully* Sum. J. Op., ECF No. 122). In that Opinion, the Court determined that consistent with the state court's opinion, Cully held a valid reversionary interest in the properties at issue and that the United States' letter on March 16, 2013 challenging Cully's ownership interest was "baseless." (*Cully* Sum. J. Op. at 17). This was predicated on the holding that Cully is a "public body" for purposes

---

[10] Cully amended its Complaint twice, once on November 15, 2019, (ECF No. 21), and finally on July 17, 2020, (Sec. Am. Compl., ECF No. 42).

of the federal regulations governing the transfer or donation of real property, thereby validating the initial transfer. The issues remaining for trial included whether the United States' actions qualified as an interference necessary to prove a taking and whether Cully had incurred damages from the taking of its reversionary interest or could incur damages from the United States' continued interference. (*Id.*). Also remaining for trial was a second claim asserting quantum meruit, as the United States failed to adequately brief why it should be granted judgment on that issue. (*Id.*).

By letter dated April 27, 2022, in a surprising move, Air Force Colonel Paul Cornwell rescinded and withdrew Colonel Burk's March 6, 2013 letter. (PX40.004). That letter states:

> In the 6 March 2013 letter from Colonel Robyn M. Burk, Commander, 611th Air Support Group to Martha Awalin, President/CEO, Cully Corporation, concerning facilities 2, 3, and 4 at Point Lay Long Range Radar Site, the Air Force determined that the 27 March 2006 Letter of Transfer was not authorized and not effective. That 6 March 2013 determination is hereby rescinded, and the letter of 6 March 2013 is hereby withdrawn. A copy of the 6 March 2013 letter, as well as the 27 March 2006 Letter of Transfer, are enclosed.

(*Id.*). This recission recognized the validity of the 2006 Letter of Transfer, a unilateral shift in the government's legal position. Subsequently, the Court held a Status Conference to discuss the United States' Recission Notice and establish its practical effects on litigation. During that proceeding, the United States explained the purpose of the newest recission:

> [T]he sole purpose of issuing that letter is that in the Court's opinion on page 17, the April 14th opinion, the Court posed the question whether the United States plans to continue with the ouster should the buildings revert to Cully. So in other words—and elsewhere in the opinion the Court refers to a future taking. The purpose was to reassure the Court and the parties as to any prospective—in other words, it's our understanding that when the lease expires, those buildings, via letter of transfer, will revert to Cully. And the 2022 letter from Colonel Cornwell offers that reassurance.

(Transcript of May 5, 2022 Status Conference (5/5/22 Tr.) at 21:19–22:6, ECF No. 147).

Based on the shifting landscape, the Court amended its April Summary Judgment Opinion *sua sponte* by Order issued on May 19, 2022. (Order Amending, ECF No. 149). The Court explained that, though a possessory estate had not yet vested, the Air Force's actions acted to cloud and forestall Cully's interest in the Buildings. (*Id.* at 5). That encumbrance completely deprived Cully of its interest in the buildings, thereby constituting a taking. (*Id.*). Because the cloud lifted with Colonel Cornwell's letter, the taking was temporary. (*Id.*). On June 29, 2022, the Court issued an Amended Summary Judgment Opinion iterating those findings. *Cully Corp. v. United States*, 160 Fed. Cl. 360 (2022) (Am. Summ. J. Op. at 11, 20–21, ECF No. 180). The Court clarified that the specifics of Cully's interest and its rights and obligations arising from the transfer in conjunction with the lease were not within the jurisdiction of the Court of Federal

Claims. (Am. Summ. J. Op. at 19 n.7). During trial, Cully agreed that this Court did not have jurisdiction to determine the allocation of rights between Cully and the Borough. (Tr. Cully Counsel, 542:15–18).

The Court identified the only issues for trial were damages, if any, as to the temporary taking and Cully's quantum meruit claim. At trial in Fairbanks, Alaska, the proof largely conformed to the Court's delineation of issues. Upon conclusion, the Court directed the simultaneous filing of proposed findings of fact and conclusions of law. (Tr. Court, 829:1–3; *see also* ECF Nos. 200, 203). The parties tendered their final briefing on September 23, 2022. (Cully Post-Tr. Br., ECF No. 205; USA Post-Tr. Br., ECF No. 204). The United States dedicated almost seven pages of its "proposed findings" asking the Court to reconsider its previous findings that a temporary taking occurred. (USA Post-Tr. Br. at 10–16).

### III.    Motion to Reconsider

As stated above, on June 29, 2022, the Court determined that Cully established a valid, reversionary interest in the property at issue and that interest was temporarily taken by the United States. (Am. Summ. J. Op. at 11, 20–21). Now, months after the amendment of that Opinion, the United States asserts that such a finding runs counter to binding Federal Circuit precedent. The Court disagrees.

The United States moves to reconsider pursuant to RCFC 54(b), which provides that a decision adjudicating fewer than all the claims or rights of fewer than all the parties and does not end the action "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Under RCFC 54(b), the Court may reconsider its interlocutory decisions at any time before judgment "as justice requires." *E&I Glob. Energy Servs., Inc. v. United States*, 152 Fed. Cl. 524, 536 (2021). Asking "what justice requires amounts to determining, within the [c]ourt's discretion, whether reconsideration is necessary under the relevant circumstances." *Farmers Coop. Co. v. United States*, 100 Fed. Cl. 579, 581 (2011) (internal quotation omitted). This Court has also held that motions "for reconsideration may not be used simply as 'an opportunity for a party to take a second bite at the apple by rearguing positions that have been rejected.'" *Johnson v. United States*, 126 Fed. Cl. 558, 560 (2016) (quoting *Shell Petroleum, Inc. v. United States*, 47 Fed. Cl. 812, 819 (2000)). "While the threshold for reconsideration under RCFC 54(b) is imprecise, it certainly 'leaves within [its] ambit . . . a good deal of space for the [c]ourt's discretion.'" *Martin v. United States*, 101 Fed. Cl. 664, 671 (2011) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)).

In *Katzin v. United States*, 908 F.3d 1350 (Fed. Cir. 2018), the case relied upon by the United States, the agency faxed a prospective buyer of the plaintiff's land documents detailing the federal government's assertions of ownership over that land. In response, the prospective buyer withdrew from the purchase agreement, and several other potential buyers refused to purchase the property. *Id.* The Federal Circuit ultimately held that "the government's mere sharing of information about its claim of ownership to real property with a third party does not constitute a physical taking (or a *per se* regulatory taking) of that property." *Katzin*, 908 F.3d at 1361. The Federal Circuit concluded that "[b]y sending the . . . fax, the government did not: physically occupy some part of Plaintiffs' property, require Plaintiffs to suffer a permanent

physical invasion, directly appropriate property, effect the functional equivalent of an ouster of Plaintiffs' possession, or deprive Plaintiffs of all economically beneficial use of Plaintiffs' property." *Id.* at 1362. "[The fax] did nothing more than disseminate information about the government's property claims to . . . other potential buyers; it did not actually change any rights in any part of [the property]." *Id.* The United States maintains that this holding now requires this Court to reconsider its finding that a temporary taking occurred. This exasperated reach at the *thirteenth* hour is misdirected.

      *Katzin* does not represent an intervening change in controlling law that may warrant reconsideration; it was available to the United States before trial and long before dispositive briefing of the takings issue. "'The litigation process rests on the assumption that both parties present their case once, to their best advantage;' a motion for reconsideration thus should not be based on evidence that was readily available at the time the motion was heard." *Seldovia Native Ass'n Inc. v. United States,* 36 Fed. Cl. 593, 594 (1996) (quoting *Aerolease Long Beach v. United States,* 31 Fed. Cl. 342, 376, *aff'd,* 39 F.3d 1198 (Fed. Cir. 1994)). The availability of existing but unused evidence as justification for denial of reconsideration applies equally to caselaw available, yet unargued, to the court. "Post-opinion motions to reconsider are not favored, especially 'where a party has had a fair opportunity to . . . litigate the point in issue.'" *Aerolease Long Beach,* 31 Fed. Cl. at 376 (quoting *Prestex, Inc. v. United States,* 4 Cl. Ct. 317, 318, *aff'd,* 746 F.2d 1489 (Fed. Cir. 1984)). Here, the United States could have supported its dispositive arguments with *Katzin* during months of litigation where the circumstances of when and whether a taking had occurred were addressed in a balanced fashion. It chose not to do so, and the timing of this motion is suspicious.

      As to the merits of this ill-timed argument, reliance on *Katzin* exhibits a misunderstanding of the Federal Circuit's holding and/or this Court's Amended Summary Judgment Opinion. First, a takings injury is fact-dependent, and this case is distinguishable from *Katzin*. There, the Circuit held "that the government's mere sharing of information about its claim of ownership to real property *with a third party*" does not amount to a taking. *Katzin*, 908 F.3d at 1361 (emphasis added). Here, the United States unequivocally told Cully, not a third party, that the earlier transfer to the Native Village Corporation was not valid and that Cully had no rights to the Buildings. In conjunction with those assertions, the United States allowed a third party to occupy the space and demanded that Cully remove its belongings from the Buildings—a dissimilar situation to one where the government merely informs a third party of title issues.

      Second, *Katzin* does not announce a categorical rule that sharing information about property interests can never constitute a taking. It stands instead for the proposition that the takings finding in such cases must account for the actual impact on the owner's interest— including whether a "permanent physical invasion" materialized or if it resulted in deprivation "of all economically beneficial use of Plaintiffs' property[.]" *Katzin*, 908 F.3d at 1362. This Court previously held that the directive to Cully to remove any possessions from the Buildings, i.e., the "ouster," standing alone did not amount to a taking. What the United States chooses to ignore is that in the same breath the Court also held that the United States' actions constituted a complete deprivation of Cully's rights, which encompasses a deprivation of all economically beneficial use. (Am. Summ. J. Op. at 20). This is a situation contemplated by *Katzin* to effectuate a taking. *See* 908 F.3d at 1362. Contrary to the United States' argument, *Katzin* is resounding

support for the Court's Amended Summary Judgment Opinion. Here, the facts show that the United States deprived Cully of all economically beneficial use of its interest in the property at issue. The United States has not shown error in the Court's prior rationale, therefore, the Court declines to revisit its prior findings.

The Court also takes a moment to reflect on the United States' assurances that the days of interfering with Cully's property interests were behind us.[11] This motion reasserts arguments that seemingly attempts to interfere with Cully's rights…yet again. The Court directed simultaneous post-trial briefing to expedite the resolution of this case. The United States failed to disclose its intent to reargue whether the penultimate issue of whether a taking occurred despite the opportunity to do so in advance of trial. By moving for reconsideration under the guise of post-trial briefing, the United States has once again disadvantaged this small Native Village by rehashing issues previously decided and thus unavailable at trial. That maneuver left the Court with few options, most of which would prolong the resolution of the merits of this case. Asymmetrical litigation tactics like those previously noted in the record of this case benefit only parties with significantly more resources. Since the adoption of the United States' overdue posture would necessarily entail a misapplication of existing law which could have been raised earlier, the Court declines to reconsider its prior ruling. As with its untimely unilateral decision to rescind the ouster letter, the United States has repeatedly shown an inclination to commandeer the pace, the structure, and the tone of this litigation to the detriment of this isolated village. That indifference is lamentable.

## IV.   Conclusions of Law

### A.   Cully failed to prove actual damages compensable by the Fifth Amendment.

To carry its burden as the plaintiff, Cully is tasked with "proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987) (citation omitted). At trial, Cully failed to offer affirmative evidence proving that it suffered actual monetary loss compensable under the Fifth Amendment.

The Fifth Amendment provides the right to just compensation for property taken; this does not include "damages" that are the "proximate result" of the government's action. *Yuba*

---

[11] "There's nothing stopping [the reversion] unless the United States affirmatively blocks that reversion, which it does not intend to do." (5/5/22 Stat. Con. Tr. 37:13–16). "[I]f [the United States] [blocked the reversion], that would be a taking under the Fifth Amendment. Cully would be entitled to full compensation." (5/5/22 Stat. Con. Tr. 38:10–12). "But we believe that, again, our position is, and the Air Force also accepts the Court's ruling that Cully -- that the transfer was valid." (5/5/22 Stat. Con. Tr. 39:23–25). "The only possible taking is a possible future taking if the United States were to block the reversion in the future. And . . . a future taking of property can't give rise to a present action for damages. So there is no present taking. There is only a possible hypothetical future taking if the United States were to block the reversion, which we are not intending to." (5/5/22 Stat. Con. Tr. 40:3–10).

*Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990) ("It is a well settled principle of Fifth Amendment taking law . . . that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking."); *see also United States v. Gen. Motors*, 323 U.S. 373, 380 (1945) ("[T]hat which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage." (footnote omitted)). In its Amended Summary Judgment Opinion, the Court held that a trial was necessary to determine whether the temporary taking of a reversionary interest was compensable. (Am. Summ. J. Op. at 20). Once the duration of a taking has been established, the Court applies the appropriate method of determining just compensation. *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012). For instance, the usual measure of just compensation for a temporary taking is the "fair rental value of the property for the period of the taking." *Id.* (citing *Kimball Laundry Co. v. United States*, 338 U.S. at 1, 7 (1949) ("[T]he proper measure of compensation [in a temporary takings case] is the rental that probably could have been obtained . . . .")). However, when considering a reversionary interest, that method is inapplicable. The Federal Circuit has held that traditional compensation methods are not exclusive; for example, there may be appropriate alternative valuation methods for the taking of an easement. *See Vaizburd v. United States*, 384 F.3d 1278, 1285–87 (Fed. Cir. 2004).

Here, the Court's decision is informed largely by the atypical nature of the interest at issue. The Court acknowledges that Cully has suffered losses, but it must also acknowledge that not all losses suffered by an individual are compensable under the Fifth Amendment. *U.S. ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943). Cully's expert witnesses, though qualified, testified to damages based on the assumption that Cully had attempted to exercise rights under the lease. But Cully did not establish that it attempted to enforce those rights with the NSB. In its opening statement, Cully states that this case seeks "to right two wrongs that [Cully] suffered at the hands of the United States." (Tr. Cully Counsel, 11:18–20). As this Court held in the early days of litigation, takings claims are compensable only when the validity of the taking is not contested—wrongdoing is not compensable under the Fifth Amendment. (*See* Order on Motion to Dismiss at 9, ECF No. 36). Cully's assertion of damages at trial is heavily tethered to assertions that the United States acted wrongfully and prevented Cully from entering into lease negotiations with the Borough, the loss of ability to sell the Buildings or effectively market them, and the loss of rental and lease payments from prospective tenants. Frankly, these are actions that sound in tort and are not within the jurisdiction of this Court. *See* 28 U.S.C. § 1491(a)(1).

Even if Cully had produced evidence that it attempted to enforce its rights with the Borough, the United States' damage expert, Joel Lesch,[12] offered unrebutted and credible testimony that Cully's *reversionary interest* for the relevant period is of negligible value because there was no market for such an interest. (Tr. Lesch, 713–721; *see also* Tr. Michael, 386:14–20 (admitting that for the relevant time frame there was no other entity ready, willing, and able to enter into a rental arrangement for the Buildings)). As a practical matter, a reversionary interest

---

[12] Mr. Lesch was qualified as an expert in the following areas: (1) determination of damages; (2) financial analysis; (3) valuation; and (4) accounting. (Tr. Lesch, 702:4–8).

cannot be leased, (*see* Tr. Lesch, 713:19–24), but may be sold. (Tr. Lesch, 714:4–9). As to that, Mr. Lesch concluded, "I didn't see any evidence that there was a likely buyer for reversionary interest during the period of the temporary taking." (Tr. Lesch, 738:14–16). Mr. Lesch also offered unrebutted testimony that it is highly unlikely that Cully could have borrowed against its reversionary interest, (*see* Tr. Lesch, 745:8–25), and that it was doubtful that a reversionary interest could be depreciated for tax purposes. (Tr. Lesch, 747:11–25; *see generally* Tr. Lesch, 748–752). As Mr. Lesch explained, Cully could not have benefitted from depreciating the Buildings for tax purposes during the period of the alleged temporary taking because they had "a deferred tax asset or net operating loss carryforwards throughout this period that they [were] unable to use" to the point that they "couldn't use all that they already ha[d]" so "adding to the pile isn't going to help [them]." (Tr. Lesch, 752:5–21).

Cully did not show that it suffered any compensable losses as a direct result of the Colonel Burk letter because it did not attempt to assert its reversionary rights or litigate its rights in conjunction with the lease. Further, Cully offered no evidence—either documentary or testimonial—which could persuade the Court to assign value to reversionary interest for those Buildings for the period from March 6, 2013 to April 27, 2022. Therefore, Cully has not shown that it is entitled to compensation under the Fifth Amendment.

### B. Cully failed to establish damages necessary to establish a quantum meruit claim.

Likewise, Cully failed to satisfy its burden of proving damages under its quantum meruit claim. Even if Cully had produced some affirmative evidence, it failed to demonstrate the existence of an implied in fact contract. *See United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986).

"Quantum meruit is a 'claim or right of action for the reasonable value of services rendered.'" *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1329 (Fed. Cir. 2006) (quoting Black's Law Dictionary 1276 (8th ed. 2004)). Where a benefit has been conferred by the contractor on the government in the form of accepted goods or services, a contractor may recover the value of the accepted goods or services received by the government prior to a rescission of the contract for invalidity. *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325–1326 (Fed. Cir. 2007) (citing *United Pac. Ins. Co.*, 464 F.3d at 1329–30). Recovery is predicated on a quantum valebant or quantum meruit basis and the contractor is compensated under an implied-in-fact contract. 492 F.3d 1317, 1325–1326.

The Court of Federal Claims has jurisdiction over quantum meruit claims "when a contractor provides goods or services in good faith under an express contract that is later rescinded for invalidity." *Lee v. United States*, 895 F.3d 1363, 1366 (Fed. Cir. 2018) (internal quotations omitted). The Federal Circuit distinguishes two types of quantum meruit claims: implied in law and implied in fact. *See Int'l Data Prods. Corp.*, 492 F.3d at 1325–26. This Court's "jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Hercules Inc. v. United States*, 516 U.S. 417, 423 (1996); *see also* 28 U.S.C. § 1491(a)(1). The two types of implied contracts differ significantly. *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998). Specifically:

> An agreement implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." By contrast, an agreement implied in law is a "fiction of law" where "a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress."

*Hercules Inc.*, 516 U.S. at 424 (citations omitted) (quoting *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)).

Implied in fact contracts have the same requirements as express, valid contracts. *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("[T]he general requirements of a binding contract with the United States are identical for both express and implied contracts."). These general requirements are "(1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance." *Lewis v. United States*, 70 F.3d 597, 600 (Fed. Cir. 1995) (quoting *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990), *cert. denied*, 501 U.S. 1230 (1991)). Importantly, "[w]hen the United States is a party, a fourth requirement is added: the government representative whose conduct is relied upon must have actual authority to bind the government in contract." *Id.* (internal quotation marks omitted).

Cully's quantum meruit claim seeks to recover the costs of remediation. However, Cully failed to prove damages relying solely upon the uncorroborated statement of Ms. Awalin, who was not employed by Cully in 2005 and thus has no personal knowledge of the remediation. (Tr. Awalin, 102:3–8). Ms. Awalin testified that Cully has records to show that it incurred at least $45,000 in costs for the garage remediation. There was no documentation proffered at trial, but instead Ms. Awalin's assurance that she could produce them "when we're done with the trial." (Tr. Awalin, 125:4–14). The Court cannot award damages when there is no convincing evidence of expenses incurred by Cully. *See Orlosky, Inc. v. United States*, 68 Fed. Cl. 296, 319 (2005) ("any failures of damage proof were not due to the inexactness of the situation, but, rather, plaintiff's own failure to produce reliable information. Such failure cannot be used as a justification for 'lessening the burden of proof'") (citation omitted).

Even if Cully could successfully show that it incurred damages, Cully's claim is dependent on whether two individuals—David Longtin and Colonel Skaja—had actual authority to bind the government. Both Mr. Longtin and Colonel Skaja testified that they never negotiated with Cully, either through then-president Hendryx or any other representative. (Tr. Longtin, 161:22–25; Tr. Longtin, 162:1–6; Tr. Longtin, 163:10–18; Tr. Skaja, 197: 2–14). Both gentlemen credibly testified that at the relevant period, they were not contracting officers and did not have the authority to enter into contracts on behalf of the Air Force obligating appropriate funds. (Tr. Longtin, 162:9–25; Tr. Longtin, 163:1; Tr. Skaja, 197 22–25; Tr. Skaja, 198:1–7, 24–25; Tr. Skaja, 199:1–3). These were points not challenged by Cully. Thus, Cully fails to demonstrate that either Mr. Longtin or Colonel Skaja had "'actual authority' on the part of the government's representative to bind the government" to enter into a quid pro quo remediation deal. This necessarily precludes the existence of an implied in fact contract and a quantum meruit claim. *See Amdahl*, 786 F.2d at 393.

Cully has the burden of proving its damages with reasonable certainty and has failed to do so. *See Lisbon Contractors*, 828 F.2d at 767. Further, Cully has failed to show the existence of an implied in fact contract. Therefore, the Court cannot award damages.

## V.    Decision and Order of Judgment

While not affecting the outcome, the record is replete with surprising instances in which the people of this Native Village Corporation were afforded little consideration by officials of the United States. From the outset, others benefited from Cully's efforts—the Air Force avoided the costs associated with remediation, the NSB obtained a long-term lease of uncontaminated property after Cully labored to redress the tainted soil left by the federal government, and the government permitted AECOM to utilize buildings otherwise promised to Cully. Cully was rewarded for its efforts with the failure of their government to abide by its assurances, ultimately resulting in more than a decade of uncertainty and asymmetrical litigation. In any event, the losses suffered by Cully are simply not redressable by the claims it asserted before this Court.

The Court finds and concludes that Cully has failed to prove damages compensable under the Fifth Amendment, as well as damages directly related to its quantum meruit claim. Therefore, the Court finds and concludes that the United States is entitled to judgment. There being no just reason for delay, the Clerk is **DIRECTED** to enter final judgment in favor of the United States pursuant to RCFC 58.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge